Tetzner et al. v. Naughton.

## HENRY TETZNER ET AL.

### V.

## SARAH NAUGHTON.

1. DAMAGES SUSTAINED.—The words "damages sustained" should be construed with reference to their known legal signification, viz.: such damages as in legal contemplation are to be regarded as the result of the wrongful act.

2. ACTION UNDER DRAM SHOP ACT.—N., appellee's husband, an habitual drunkard, while in a state of intoxication was run over by the cars and killed. Appellee brought a joint action against T. H. and L., saloon keepers, who had sold her husband intoxicating liquor on the day of his death, and others, who were charged with causing N. to become an habitual drunkard by repeated sales of liquor to him at times preceding. *Held*, that N. lost his life by reason of the particular intoxication on the day of his death. The fact that he was an habitual drunkard, even if that induced him to drink the liquor by means of which he became intoxicated, could not in a legal sense be deemed the cause of his death. The sale of the intoxicating liquor by T. H. and L., on the day of his death, was the intervening, independent act of a third party between the wrongful acts complained of and the injury, and was the direct and immediate cause of the death.

3. PRACTICE—MISJOINDER OF PARTIES.—The parties who alone contributed to cause habitual intoxication can not be made responsible jointly with those who only contributed to a particular intoxication. The two classes of persons would not contribute to the same injury.

4. EVIDENCE, NECESSARY TO PROVE THE CAUSING IN PART OF HABITUAL DRUNKENNESS.—The evidence necessary to prove the causing in part of habitual drunkenness should be such that the jury would be able to say that each party against whom they found a verdict had sold or given to such person liquor a sufficient number of times and continued the practice to that extent, that he had materially aided in bringing about a state of habitual drunkenness. The quantity contributed must be appreciable.

5. INSTRUCTIONS.—To instruct the jury to give exemplary damages, if they found actual damages, was error. This should be a discretionary matter with the jury, based on substantial reasons.

APPEAL from the Circuit Court of Kane county; the Hon. C. W. UPTON, Judge, presiding. Opinion filed February 9, 1883.

Mr. HARRY RUBENS and Mr. W. H. WING, for appellants; that a judgment at law is a unit and if wrong as to any of

Tetzner et al. v. Naughton.

the defendants it must be set aside as to all, cited Earp v. Lee, 71 Ill. 193; Ragor v. Kendall, 70 Ill. 95; Boyd v. Watt, 27 O. 259.

Changing the form of the verdict by order of the court does not alter actual facts contained in the verdict as originally rendered: Freese v. Tripp, 70 Ill. 497.

This was no case for exemplary damages: Brautigan v. White, 73 Ill. 562; Meidel v. Anthis, 71 Ill. 243; Keelerman v. Arnold, 71 Ill. 634; Fentz v. Meadows, 72 Ill. 541; McEvoy v. Humphrey, 77 Ill. 390; Brannon v. Silvernail, 81 Ill. 434; Kreiter v. Nichols, 28 Mich. 496; Steel v. Thompson, 42 Mich. 594; Weitz v. Ewen, 52 Ia. 37; Franklin v. Schermerhorn, 8 Hun (N. Y.), 112; Keedy v. Howe, 72 Ill. 133; Confrey v. Stark, 73 Ill. 188; Ragor v. Kendall, 70 Ill. 95; Brockman v. McDonald, 16 Ill. 112.

As to a court allowing a plaintiff upon the motion of defendant for a new trial, to present counter affidavits: Mendall v. Kimball, 85 Ill. 582; Gracieo v. Weir, 45 Cal. 53; Thelin v. Thelin, 8 Bradwell, 421.

The judgment is excessive and out of proportion to the measure of damages: Loewenthal v. Streng, 90 Ill. 74; Gravett v. Mugge, 89 Ill. 218.

The court erred in entering the judgment in vacation, as there was no order nor stipulation that the motion should be taken under advisement and decided in vacation: Blair v. Reading, 99 Ill. 600.

Mr. FRANK CROSBY and Mr. JAMES COLEMAN, for appellee; as to the judgment entered in vacation time, cited R. S. 1882, Chap. 37, § 47; T. P. & W. R. R. Co. v. Eastburn, 79 Ill. 140.

As to the instructions given: Emory v. Addis, 71 Ill. 273; Hackett v. Smelsley, 77 Ill. 109; Ruth v. Eppy, 80 Ill. 283; Schroder v. Crawford, 94 Ill. 357.

LACEY, J. This was an action on the case brought by the appellee against the appellants, Henry Tetzner, Robert Beckwith, John Buckrice, Bernard Hagelow, Jacob Frieler, Henry Holthusen and Christ Lay, and also the following

named persons, viz.: Charles Mach, Fritz Graze, William Wahl, Louis Gerlach, Walter Aubaker, Louis Schroder, John Dietrich, Charles Hansberg, Charles Hunter and James Clinton, all saloon keepers except Robert Beckwith, who was the landlord of Henry Tetzner, to recover damages claimed to have been sustained by her for the loss of her means of support, on account of the demoralization and death of her husband, Thomas Naughton, caused, as she charged, by the sale to her husband of intoxicating liquors by the above named parties, who were the original defendants.

The action was brought under the Dram Shop Act, and was tried May 2, 1882, and on the trial of the cause the appellee being unable to prove any sale of liquor to her husband by the intervening agency of the ten last named defendants, the suit was on her motion dismissed as to them.

The jury found a verdict in favor of the appellee against the seven defendants, the appellants, for the sum of $2,804, finding four dollars of that sum actual damages, and the balance, $2,800, exemplary damages. A motion for a new trial being overruled by the court, judgment was rendered on the verdict, from which judgment an appeal was taken to this court.

The declaration contains four counts. The first count charges that Thomas Naughton was her husband on and before September 25, 1876, and remained so until his death, September 23, A. D. 1881; that for a long time prior to the first named date he followed the business of contractor, farmer, butcher, speculator and day laborer, and derived therefrom a yearly income of $2,000, and provided comfortably and liberally for his wife and six minor children. That, on the said 25th day of September, 1876, and other days preceding his death, the defendants at the town and city of Elgin sold and gave to said Naughton intoxicating liquors, and thereby caused him to become habitually intoxicated, and in consequence thereof he wasted and squandered his money and property and became impoverished, reduced, degraded and wholly ruined in body and mind and estate, and wasted his time in idleness and dissipation, and spent most of his earnings and some of the earn-

ings of his minor children for liquor at the dram shops of the defendants, neglected his business, and by reason thereof failed to provide for his wife, himself and children, etc. The second count is the same in substance as the first with exception of the additional charge that in further consequence of the habitual intoxication caused by the defendants, he, on the 22d day of September, A. D. 1881, was run over by the cars, and in consequence died of his injury on the 23d day of September, 1881, by means of which appellee had been permanently injured in her means of support, etc. The third count is in substance the same as the first with the exception it charges Robert Beckwith and James Clinton were the owners of two certain buildings where all the liquors were sold, and rented them to the other defendants, knowing that intoxicating liquors were to be sold in them.

The fourth count is the same as the last above named, with the exception it shows the death for the same causes and same reasons set out in the second, and claims damages for injury to her permanent means of support on account of the death of her husband. Each defendant pleaded separately a plea of the general issue by their respective attorneys. As to the character and personal history of Thomas Naughton, and the circumstances of his death, the evidence pretty clearly shows that he had been a constant drinker for some twenty-five years, and for the last ten or fifteen years had been an habitual drunkard and no change appeared in him in this particular that was very marked either for the better or worse, for at least the last ten years prior to his death.

Some of the witnesses thought that for the last two years he had rather improved because the saloon keepers refused to sell him so much liquor as they formerly had done. Others thought he was rather worse. He had shifted around in various employments; at one time, about from seven to nine years before his death, he had been a saloon and hotel keeper himself, the saloon being attached to his hotel, and after that followed various employments as a laborer and otherwise. Witnesses state that he was rather better as a "boss" than a laborer. He had ceased to have any property or be of any sup-

port to his family for seven or eight years prior to his death. At the time of his death he was utterly destitute of any means, his funeral expenses being paid by money raised by subscription by his neighbors, including some of the saloon keepers.

The jury were no doubt justified in finding that he had become demoralized and worthless to himself and his family by the constant and excessive use of intoxicating liquors, and that he had been habitually intoxicated for many years. The jury found that the actual damage to his wife to her means of support was four dollars. They found his value to be merely nominal. When sober he appeared to be vigorous enough and capable of doing work if he had been so disposed, but appeared to prefer spending his time in drinking and idleness.

All that the proof shows in regard to the manner of his death is that he went to the depot of a railroad about half past six o'clock in the evening of Sept. 22, 1881, and that shortly after he was found with his limbs badly crushed, and he was badly shocked; that he died the next day of the wounds received. No doubt he was run over by the cars, and the evidence, we think, fairly justified the jury in finding that he came to his death by reason of his intoxication that was upon him at that time.

As to where he got the intoxicating liquor that caused his intoxication in whole or in part, by means of which he lost his life, the evidence only tends to show that he got one drink that day in Henry Tetzner's saloon, and that he was in the defendant Hagelow's saloon and was seen to drink one drink in that saloon and one in Lay's saloon.

The drink charged to have been sold by Tetzner was proved by James O'Brien, who drank with him. There is no evidence that the other defendants, Frieler, Buckrice and Holthusen sold him or gave him liquor that day. The charge in the second count of the declaration is that Naughton lost his life on account of his habitual intoxication, induced by the ntoxicating liquors sold or given to him by the defendants. This charge is wholly unsustained; he lost his life by reason

Tetzner et al. v. Naughton.

of the particular intoxication on the day of his death. The fact that he was an habitual drunkard, even if that induced him to drink the liquor by means of which he became intoxicated, could not, in a legal sense, be deemed to be the cause of his death. The appetite and desire to drink intoxicants may have been the cause of his drinking the liquor that caused his death, but in that case it would only be the cause of the cause, not the cause itself.

In the case of Shugart v. Eagan, 83 Ill. 56, brought to recover damages, under the Dram Shop Act, referred to the permanent means of support of the plaintiff by the death of her husband, alleged to have been caused by the sale of intoxicating liquor to her husband by the defendant, by means of which he became intoxicated and lost his life in consequence.

It was claimed that the plaintiff's husband, while in a state of intoxication induced by liquors so obtained, insulted or menaced one McGraw who thereupon stabbed him inflicting a wound whereof he shortly afterward died. The court below ruled that this gave a right of action to plaintiff to recover compensation for loss of her husband's life. Justice Scholfield, deciding the case, says:

"The words 'damages sustained' should be construed with reference to their known legal signification, i. e., to mean such damages as in legal contemplation are to be regarded as the result of the wrongful act." In that case it was decided that the death of the husband was not in legal contemplation the result of selling the liquor, that the intoxication was not in law the cause of his death.

In passing on the case, the judge, in deciding, recognized the rule laid down by Lord Bacon as being sound, saying that it was sometimes difficult to decide whether particular acts were to be regarded as the immediate or remote cause. Lord Bacon says: "It were infinite for the law to consider the cause of causes, their impulse on one another, therefore it contenteth itself with the immediate cause and judgeth of acts of that kind without looking to any further degree." Bacon's Maxims, Broom's Legal Maxims, 165.

The court says further: "It has been held that the inter-

vention of an act of a third person between the wrong complained of and the injury sustained, which was the direct or immediate cause of the injury, breaks the causal connection and consequently there can in such case be no recovery except as against the person whose immediate agency produced the injury." Citing Wharton on Negligence, Sec. 134, and authorities cited. In applying this rule to the Shugart case the court says: " The death not resulting from intoxication or from any disease induced or aggravated from the use of liquor, but solely from the direct and unlawful act of McGraw, we have a case as clearly within this principle."

The case at bar we think is as clearly within this principle as that. If Tetzner, Hagelow and Lay sold the appellee's husband intoxicating liquor which he drank and received his death in consequence of intoxication induced thereby, certainly this was an intervening independent act of a third party between the wrongful acts complained of and the injury, and was the direct and immediate cause of the death. This fills every condition of the rule. How, then, can Holthusen, Frieler and Buckrice be made responsible for damages resulting to the permanent means of support of appellee caused by the death of Thomas Naughton, deceased? In the case of Schroder v. Crawford, 94 Ill. 357, it is true that a recovery was sustained where the facts were that Crawford came to his death by being run over by the C. & A. railroad train in the night time while in a helpless condition from intoxication in part by liquors sold by Schroder's lessee. Between the place where the liquor was sold to Crawford's home there were lying two railroad tracks. Justice Scott, in delivering the opinion, said the death was not caused by the direct and willful and criminal act of a third party, as in the Shugart case to which his attention had been called and which he was endeavoring to explain and harmonize with the decision he was rendering. He says the Schroder case " was quite different, for in that case it could not be affirmed that it was not a natural and reasonable consequence of the intoxicat'on, that a person intoxicated, with two railroad tracks lying between him and his home, should in a dark night meet with injury or death upon a railroad track from a

running engine or train of cars—that it was not such a conse-
quence as in the ordinary course of things might result—and
says a similar doctrine was held in Emory v. Addis, 71 Ill.
273. He does not disapprove of what Justice Scholfield said
in the Shugart case as to the rule above quoted; but Justice
Scott, in commenting on the doctrine of intervening agency
announced in the Shugart case, says: "So it might be said
where one from intoxication lies down and becomes frozen to
death, or falls into a fire and is burned to death, or is
drowned by a freshet, as in Hackett v. Smelsley, 77 .Ill. 109,
that the intervening agency of frost, fire and freshet occa-
sioned the death and was the proximate cause, and thus no lia-
bility under this statute—to hold so would be to construe
away the statute." He says further it was not the intention
of the statute "that the intoxicating liquor of itself alone ex-
clusive of other agency should do the whole injury." But the
doctrine laid down in the Shugart case was announced long
after the Emory and Hackett cases were decided, and the doc-
trine must be presumed to be declared with full knowledge of
what had been decided in those cases. Considering all that
had been decided in the cases above referred to, we must re-
gard the rule announced in the Shugart case in regard to the
doctrine of intervening agency as being still in force—though
not to be taken in its literal sense. There where the forces of
nature, such as are specified in the Schroder case and of others
of like character that might arise, and also where a party is
injured by a railroad train, not being the willful act of the
conductor or by other like causes analogous, then this would
not be the intervening independent act of a third party
within the meaning of the rule. The action of frost, fire or
water causing death could not be considered the "independent
act of a third party," nor accident such as being run over by a
railroad train, unaccompanied by intention; or accident done
by other third parties unintentionally and unintelligently,
might not be so considered under the rule. And in case the
accident or injury came about in the natural and reasonable
course of events, and such as might naturally arise from a
state of intoxication, and where without such intoxication the

injury would not have happened. But in a case like the Shugart case, though the deceased was intoxicated and· insulted and menaced McGraw, the action of McGraw in stabbing him was in law the independent act of a third party knowingly done, and the injury could not be deemed to be the consequence of intoxication, though the drinking of the liquor and intoxication was the cause of the cause.

So in this case the intoxication of Naughton induced by selling liquor to him by a portion of the defendants on the day of his death, would come under the principle announced in the Shugart case and would be the cause of his death, and the desire to drink induced, it may be in part by the sale of intoxicating liquor at other times by the other defendants could only be regarded, the cause of the cause. The selling of the liquor, by a portion of the defendants, to Naughton, an habitual drunkard, was as much a willful, illegal, criminal act as the stabbing done by McGraw, as in the Shugart case, and those defendants would be held as the responsible parties and not those who had sold him intoxicating liquor years and months before.

The evidence shows that Naughton was able-bodied and to all appearances as sound in body and mind as ever, except for the habits he had contracted of getting habitually intoxicated. We think the death of Naughton was not the reasonable and natural result of the acts of those defendants who had not sold him intoxicating liquor on the day of his death, nor could such result be reasonably anticipated by them. Those defendants charged with causing Naughton to become an habitual drunkard, and from whom damages are claimed for such result caused by repeated sales of liquor to him, and who sold him no liquor on the day of his death can not be charged jointly with those who only sold the liquor that caused the last intoxication, unless the latter contributed to cause his habitual intoxication, but there could be no joint action for the result of his death.

There should be no recovery against the appellants except for such damages as are common to all, and damages if any arising to appellee's permanent means of support caused by the death

of her husband are not common to all, as we have shown.

It is true section 8, of Chap. 43, gives a joint action to any person who shall be injured in his means of support by any intoxicated person, or in consequence of the intoxication, habitual or otherwise, against any person or persons who shall, by selling or giving intoxicating liquors, have caused the intoxication in whole or in part of such person or persons. The meaning of which plainly is that all such persons who participate in causing a particular or several particular intoxications of a person, and damages accrue therefrom, the person damnified can sue such persons jointly or severally to recover for such injury or injuries. Also all persons, who only by the sale of liquor to any person materially contribute to make him an habitual drunkard, and damage accrues, may be sued jointly by such person, but two classes can not be sued jointly, and those who alone contributed to cause habitual intoxication, made responsible jointly with those who only contributed to the particular intoxication and the reverse. To give the statute such a construction as to allow such joint suits would have the effect to cause great wrong and injustice, and such in our judgment could not have been the intention of the legislature. The two classes of persons would not contribute to the same injury.

Keeping in mind these principles, it is seen there could be no recovery at all for damages resulting to appellee from the death of her husband, for at least three of the defendants are not responsible in a legal sense for that. And there could be no recovery unless each of the defendants caused in whole, or in part, the appellee's husband, by sales of intoxicating liquor to him, to become an habitual drunkard, and actual damages accrued to appellee's means of support in consequence. What is the proof as to the participation of each of the defendants in making in whole or in part, the deceased Naughton an habitually intoxicated person? The defendant Tetzner, never, so far as the evidence discloses, sold appellee's husband but one drink, and that is denied and the evidence very conflicting.

That was on the day of Naughton's death, and Tetzner

swears that he had not sold Naughton any liquor for seven years, and ordered his bar keeper not to sell him any, and knows of his being refused several times.

The evidence shows that Buckrice sold him one drink of some kind of intoxicating liquor within one year prior to his death, and at another time two glasses of beer about one month before he was hurt, and about three years before that time, deceased Naughton spent five dollars drinking and treating his friends at Buckrice's.

At one time deceased drank at Hagelow's saloon within a year prior to his death, at another, once within two years, and the witness had seen Hagelow refuse to let him have anything but pop, and he took one drink at the latter's place on the day he was killed. One time, one year ago, the last winter before the trial, he spent five dollars at Hagelow's, drinking and treating.

The defendant Lay sold him one glass of beer, prior to the day he was killed, and one drink of some kind of liquor on the day of his death. The defendant Frieler sold deceased one or two glasses of whisky when he was at work on the ice with Himes, the witness, one glass of whisky about a year before his death, and at one time still another glass.

The proof shows that as to Holthusen, the deceased drank one drink of some kind of liquor at the first saloon south of Hagelow's, once kept by Holthusen. This is the sum total of all the proof against all the defendants to establish the issue against each one of them, that he had caused appellee's husband to become an habitual drunkard in whole, or in part. The sum total of all the drinks shown to have been sold or given to Thomas Naughton by all the six defendant appellants, ranging through a period of three years, was thirteen, and three of those on the day of his death, and five dollars spent at one time about three years before, and five dollars about two years before.

There is no evidence that the deceased had been in the habit of visiting any of the rooms of the defendants, or spending his time there, except on the occasions when the above purchases were made.

It will be seen that as to Holthusen, there is no proof whatever that he ever sold the appellee's deceased husband one drop of intoxicating liquors, yet a verdict was rendered against him of $2,804, four dollars actual, and $2,800, exemplary damages, on the proof alone that deceased had on one occasion, some time prior to his death, obtained a drink of intoxicating liquor at a place where he had once kept a saloon. The appellee claims that the word " once " should be " one " which would make the witness say he got the drink at the saloon south of Hagelow's, one where Holthusen kept, but we have examined the record and find that the word "once " was used and not " one."

This is a cause of action to recover general damages against the defendants on account of the habitual intoxication of the deceased, and not for any special damages caused to her means of support by reason of any particular intoxication.

We think the evidence should be such that the jury should be able to say that each party against whom they find a verdict, had sold or given to such person liquor a sufficient number of times, and continued the practice to that extent that he had materially aided in bringing about such demoralized condition—a state of habitual drunkenness. Is it to be said as a matter of law or fact, that one drink sold to a person during the time he is contracting such habit, or after it is contracted, is within the meaning of the statute, a causing in part habitual intoxication in such person?

We can readily see how one drink may contribute to make a person intoxicated, but how can it materially aid in creating a confirmed habit? In one sense it may do so, but only in the sense that one grain of sand may contribute to form in part the beach on the sea-shore.

It seems to us that it is not the sense in which the statute should be construed. The causing in part of habitual drunkenness should be such a contributing to that end that a reasonable mind should be able to say, after hearing all the evidence, that there was a substantial aiding to bring about such consequence—that the quantity contributed was appreciable. The first instruction given for the appellee we

think is erroneous requiring the jury to give exemplary damages if they found actual damages, telling the jury the appellee was entitled to it. This should be a discretionary matter with the jury, based on substantial reasons. If then the judgment is erroneous against one or more of the defendants it is so as against all, and must be reversed. Earp v. Lee, 71 Ill. 197; Rodger v. Kendall, 70 Ill. 95; and we are not satisfied on the whole record that there has been a fair trial.

The verdict of the jury is against the manifest weight of the evidence as to one at least; it therefore is reversed and cause remanded.